Jyotin Hamid (jhamid@debevoise.com)
Benjamin M. Aronson (baronson@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-1031
Fax: (212) 909-6836

*Attorneys for Plaintiff GlaxoSmithKline Biologicals, S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
GLAXOSMITHKLINE BIOLOGICALS, S.A.,    :
                                      :     No. 13 Civ. 1395 (PKC)
                Plaintiff,            :
                                      :     ECF CASE
        v.                            :
                                      :
HOSPIRA WORLDWIDE, INC. and           :
HOSPIRA, INC.,                        :
                                      :
                Defendants.           :
------------------------------------- X

## DECLARATION OF LAURENT CHEVALLIER

I, Laurent Chevallier, hereby declare as follows:

1.      I am a Procurement Director at GlaxoSmithKline Biologicals, S.A. ("GSK"), and I was intimately involved with the agreement at the heart of this case, entered into between GSK and Hospira Worldwide, Inc. and Hospira, Inc. (together, "Hospira"), for the production and manufacture of an influenza vaccine product. I submit this declaration, on personal knowledge, or, where indicated, on information and belief, in opposition to Hospira's motion to transfer this action to the U.S. District Court for the Northern District of Illinois.

2.      This dispute has very little connection to Illinois. None of the GSK personnel who are potential witnesses in this case are located in Illinois; nearly all are, like me, located in Belgium. We negotiated and executed the agreement at the heart of this case in Belgium. Hospira's obligation under the agreement was to produce an acceptable vaccine product at Hospira's facility in McPherson, Kansas. GSK personnel traveled frequently to Kansas, and Kansas was the site of all of the most important face-to-face meetings between GSK and Hospira during the course of the project. Kansas is also the site of Hospira's repeated failures to produce an acceptable vaccine product. The failures at Hospira's Kansas facility are the crux of this case because it is those failures which led to Hospira's breach and eventual unilateral termination of our agreement. If there is any location in the United States which should be considered central to this dispute, it is Kansas, not Illinois.

3.      We chose to bring this action in New York because the agreement at issue is governed by New York law and because it was the most convenient of all potential fora in the United States. In our experience, traveling to New York from Belgium is more convenient and easy than traveling to Chicago given the greater availability of flights and the shorter distance. New York is also more convenient for our in-house legal team, who will be overseeing the prosecution of this lawsuit and who are based in Philadelphia, and for the New York external counsel we selected to represent us in this case because of their expertise in New York contract law.

**Background on Dispute**

4. This case involves a set of contracts (the "Agreement") entered into between GSK and Hospira for the manufacture of an influenza vaccine product, which was to be sold and distributed across the United States, including in the State of New York. Under the Agreement, GSK supplied Hospira with the bulk for the filling of the vaccine product, and Hospira agreed to use the bulk supplied by GSK to produce batches of the vaccine product that would be compliant with the Agreement's quality, timing and other requirements; in accordance with current good manufacturing practices; appropriate for regulatory submission by the end of 2011; and otherwise acceptable to GSK at its sole discretion.

5. Hospira failed to meet any of these obligations. The vaccine product produced by Hospira (far behind schedule) contained numerous quality problems, was not in accordance with current good manufacturing practices, was not appropriate for regulatory submission, and was not acceptable to GSK.

6. In the face of Hospira's repeated failures, GSK attempted to work with Hospira to help Hospira come into compliance with its contractual obligations. Among other things, GSK extended deadlines and was open to considering new specifications for the vaccine product once it became apparent that Hospira would be unable to produce an acceptable product based on earlier specifications. For example, although the parties initially contemplated that a trivalent ("TIV") version of the vaccine product would be used, the validation batches of the TIV version produced by Hospira contained invalid cleaning runs and critical deviations that failed to satisfy the project's validation

23772697

requirements. The TIV version produced by Hospira thus did not satisfy Hospira's contractual obligations under the Agreement. GSK therefore attempted to work with Hospira to launch a different version of the vaccine product – QIV – that would satisfy Hospira's contractual obligation to deliver an acceptable vaccine product.

7.   But despite GSK's flexibility and efforts to help Hospira comply with its obligations and salvage the project, Hospira was never able to meet its contractual obligations. On March 22, 2012, after repeatedly and continuously failing to deliver an acceptable vaccine product – whether TIV or QIV – Hospira gave up. On that day, Hospira informed GSK that Hospira was unilaterally terminating the contract, more than three years before the end of the contract's term in December 2015. Hospira confirmed its unilateral termination in writing and subsequent conversations.

### Potential Witnesses

GSK Personnel

8.   None of the GSK personnel who are potential witnesses in this action are located in Illinois.

9.   The GSK personnel who were substantially involved in the Hospira project, and therefore may be potential witnesses, are located in Belgium. These include myself, Jean-Jacques Follebouckt (VP – External Supply), Vincent Vandamme (VP – Quality), Vincent Dubois (Director – Quality), Fabrice Berthaud (Project Manager, Global Validation), Patrice Lemonnier (former Procurement Director, CMO), Taoufik Mabrouk (Director for Product Transfer) and Marcel Laubacher (VP – Procurement &

Supply Chain).

Potential Witnesses Currently at Hospira

10. I have reviewed the Declaration of Steven Tran submitted with Hospira's motion to transfer, and, in particular, I have reviewed Exhibit 2 to Mr. Tran's declaration, which purports to list current and former Hospira personnel who may be witnesses in this case.

11. Mr. Tran lists eight current Hospira personnel who he contends are likely witnesses in this case and are located in Illinois: himself, Kevin Orfan, Peter Larson, Randy Farmer, Heather Meredith, Virgina Ertmann, Natasha Rivas and Stace Porter.

12. I agree that two of these – Mr. Tran himself and Mr. Larson – were substantially involved in the project. The others had only very limited involvement.

Potential Witnesses Formerly at Hospira

13. Mr. Tran lists three former Hospira personnel who he contends are likely witnesses in this case and are located in Illinois: Anthony Cacich, Rick Isaza and Oliver Vogt.

14. I agree that Mr. Cacich was substantially involved and is likely a witness in this case. Messrs. Isaza and Vogt, however, had no involvement of which I am aware. Indeed, I do not recall ever meeting or communicating with either of them.

**Documents**

15. The documents that may be relevant to this case – emails, contracts and various work papers created by the parties during the life of the agreement – are, to my

knowledge, all available electronically and are accessible from any location.

## Operative Facts

Negotiation and Execution of the Agreement

16.     The Agreement in this case consists of a Toll Manufacturing Agreement and certain schedules to that contract, some of which were themselves individually executed contracts between the parties and which formed a part of the overall agreement between the parties.

17.     These contracts were negotiated by telephone and email. On the GSK side, this was done from Belgium. We also executed the contracts in Belgium.

Performance under the Agreement

18.     GSK produced the raw material/bulk in Canada.

19.     Hospira's obligation under the Agreement was to produce a vaccine product at its facility in McPherson, Kansas. Kansas is where all of the most important events in the United States, including the failures which have led to this dispute, occurred.

20.     The GSK team traveled frequently to Kansas to inspect Hospira's production facilities and processes and to assess Hospira's compliance with its contractual obligation to produce batches of the vaccine product that would be compliant with the Agreement's quality requirements and in accordance with current good manufacturing practices.

21.     As noted above, the parties initially contemplated that a TIV version of the

23772697

vaccine product would be used. However, the validation batches of the TIV version produced by Hospira in Kansas contained invalid cleaning runs and critical deviations that failed to satisfy the project's validation requirements. Those failures occurred at the Kansas facility, were observed in Kansas and were documented in memos, forms and correspondence created in Kansas.

22. Because the TIV version produced by Hospira in Kansas failed to satisfy Hospira's contractual obligations under the Agreement, GSK attempted to work with Hospira to develop a QIV version. On February 7, 2012, GSK's and Hospira's respective teams met at the Kansas facility for a "kick-off" meeting to discuss the switch to QIV. On March 6-7, 2012, the respective teams met again in Kansas for an intensive two-day program to try to confirm Hospira's commitment and to attempt to work through and resolve the numerous problems that Hospira was experiencing at its Kansas facility which were preventing Hospira from meeting its contractual obligations.

Termination of the Agreement

23. Just weeks after the intensive two-day program in Kansas, Hospira gave up. On March 22, 2012, Mr. Cacich of Hospira called Messrs. Laubacher and Lemmonier of GSK and told them that Hospira was unilaterally terminating the contract. Messrs. Laubacher and Lemmonier were in Belgium at the time of the phone call. On information and belief, Mr. Cacich was in New York.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Rixensart, Belgium on this 25th day of April, 2013.

_____
Laurent Chevallier